# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 186 | **DATE** | 6/14/2004 |
| **CASE TITLE** | Firstar Bank vs. Wells Fargo Bank, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, plaintiff's motion for summary judgment [#21] is denied and defendants' motion for summary judgment [#23] is granted. Judgment is entered in favor of the defendants.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUN 16 2004 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | 37 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 6/14/2004 date mailed notice | |
| MD | courtroom deputy's initials | | MD mailing deputy initials | |

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| FIRSTAR BANK, N.A., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> WELLS FARGO BANK, N.A., and ) <br> THE FEDERAL RESERVE BANK OF ) <br> CHICAGO, ) <br> ) <br> Defendants. ) <br> ) | No. 02 C 186 <br> Judge Joan H. Lefkow <br><br> **DOCKETED** <br> JUN 1 6 2004 |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Firstar Bank N.A. ("Firstar"), has filed a three-count Amended Complaint against defendants, Wells Fargo Bank N.A. ("Wells Fargo") and The Federal Reserve Bank of Chicago ("FRBC"). In Count I, Firstar alleges that Wells Fargo and FRBC breached certain presentment warranties imposed by the Uniform Commercial Code ("UCC"). In Count II, Firstar alleges that FRBC breached warranties imposed under Regulation J, 12 C.F.R. § 210.6(b)(1).[1] Before the court are the parties' cross-motions for summary judgment. For the reasons set forth below, Firstar's motion is denied while defendants' motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and

---

[1] Count III, which was a negligence claim against Wells Fargo, was voluntarily dismissed on November 4, 2003.

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## FACTS[2]

### A. Background of Check Processing

A check is written by a drawer and delivered to a payee. (Def. L.R. 56.1 ¶ 6.) The payee typically deposits the check into his or her bank account to obtain the proceeds of the check. (*Id.*) The payee's bank (referred to as the depositary bank) sends the check through the bank

---

[2]The facts as set forth herein, taken from the parties' statements of material facts and supporting materials, are undisputed unless otherwise indicated.

collection system to obtain payment from the drawer's bank (referred to as the drawee or paying bank). (*Id.*) The bank collection system is a collection of banks, clearinghouses and Federal Reserve Banks governed by Articles 3 and 4 of the UCC and federal regulations. (*Id.*)

Banks process and sort checks automatically using Magnetic Ink Character Recognition ("MICR") technology. (Def. L.R. 56.1 ¶ 11.) This technology permits the electronic reading and mechanical processing of paper checks. (*Id.*) Banks are assigned an identifier called a routing number for processing checks. (*Id.*) Checks that are to be processed automatically must have a routing number printed in magnetic ink along the bottom of the check that identifies the paying bank. (*Id.*) The routing number tells processing banks to which bank the check for payment should be sent. (*Id.*)

## B. The Check at Issue

On October 12, 2000, a check in the amount of $186,587 (the "Check") was deposited into an ATM in Tempe, Arizona. (Def. L.R. 56.1 ¶ 15.) The Check was made payable to "Najam Ali Property," which had had an account at Wells Fargo since September 2000. (*Id.*; Pl. L.R. 56.1 ¶ 6.) The drawee of the Check was Central National, an entity to which Firstar, by merger, is the successor in interest. (Def. L.R. 56.1 ¶ 15.) The drawer on the Check purported to be an entity identified as "Business Central." (Pl. L.R. 56.1 ¶ 8.) The MICR encoding on the Check includes an American Banking Association ("ABA") routing number identifying the drawee bank as 263178478. (Pl. L.R. 56.1 ¶ 9.) The MICR encoding on the Check includes a routing number identifying the drawer as 1981572. (Pl. L.R. 56.1 ¶ 10.) The check was not endorsed by either Najam Ali Property or by Orzrenetta Howard, who opened the Najam Ali Property account. (Pl. L.R. 56.1 ¶ 6, 12.)

Wells Fargo accepted the Check for deposit into the Najam Ali Property account and processed the Check for payment. (Def. L.R. 56.1 ¶ 16.) The Check was rejected during processing because the automated processing machine could not read the routing number on its MICR line. (*Id.*) Because the routing number on the Check was not machine readable, Wells Fargo "stripped" the Check with the same routing number and reprocessed it. (*Id.*) In other words, Wells Fargo attached to the Check the same routing number that existed on it, but in a machine readable form. (*Id.*)

The first four digits of the ABA routing number on the Check indicated that the paying bank was located in the region served by the Federal Reserve Bank of Atlanta, Jacksonville office ("FRB Jacksonville"). (Pl. L.R. 56.1 ¶¶ 15-16.) Listed on the face of the check, however, was "Central National Bank" and an address in Mattoon, Illinois.[3] (Pl. L.R. 56.1 ¶ 23.) Thus, the address on the face of the check is not located in the same Reserve Bank check processing region as the address indicated by the original routing number appearing on the Check. (*Id.*)

On October 18, 2000, the Check was in the possession of FRB Jacksonville. (Pl. L.R. 56.1 ¶ 15.) Digits five through eight of the ABA routing number corresponded to the account of Campus USA Credit Union ("Credit Union"). (Pl. L.R. 56.1 ¶¶ 17-18.) On October 20, 2000, FRB Jacksonville charged the amount of the Check against the account of Credit Union. (Pl. L.R. 56.1 ¶ 18.) Thereafter, Credit Union initiated an inquiry regarding the Check with FRB Jacksonville. (Pl. L.R. 56.1 ¶ 19.) On that same date, FRB Jacksonville credited the Credit Union's account for the full amount of the check. (Pl. L.R. 56.1 ¶ 20.)

---

[3]Central National bank had been acquired by Mercantile Bank, which subsequently merged with Firstar. (Pl. L.R. 56.1 ¶ 22.) Hereinafter references will only be made to Firstar.

On October 23, 2000, the Check was reprocessed by FRB Jacksonville and the drawee was now identified as having ABA routing number 071102102, which corresponded with Firstar. (Pl. L.R. 56.1 ¶¶ 21-22.) During this time period, FRBC's records indicated that checks drawn on routing number 071102102 were to be picked up by a courier service for delivery to Firstar. (Def. L.R. 56.1 ¶ 19.) Based on the routing number on the Check and the instruction on file, FRBC's Peoria office charged the Check to Firstar's account on October 23, 2000. (Def. L.R. 56.1 ¶ 19; Pl. L.R. 56.1 ¶ 25.)

On November 27, 2000, FRBC sent a fax to Firstar in Mattoon, Illinois, where the "Business Central" account was allegedly maintained. (Pl. L.R. 56.1 ¶ 29.) This fax inquired whether the Check was "ever charted to this person's account." (*Id.*) Firstar claims that it is unclear whether this fax was made from a copy of the Check or from the Check itself. (Pl. L.R. 56.1 ¶ 30.) In any event, Firstar maintains that this was the first opportunity for it to view the name and account number of the alleged customer on the Check. (Pl. L.R. 56.1 ¶ 31.)[4] As it turned out, the identification of "Business Central" as a Firstar customer and the drawer account

---

[4] Firstar goes on to state that "[n]othing in the alleged documentation supplied by [FRBC] contained any information to permit Firstar to determine either the customer or the account to which the debit should be applied, or whether the Check was real or fraudulent." (Pl. L.R. 56.1 ¶ 33.) In response defendants state that FRBC sent the Check to a courier service for delivery to Firstar, in accordance with instructions it had on file for settlement of checks drawn on the 071102102. (Def. Resp. to Pl. L.R. 56.1 ¶ 33.) Defendants cite their own statement of material facts at ¶ 19, but that paragraph does not establish that FRBC sent the Check at issue to a courier service for delivery to Firstar. It instead provides that

> [i]n October 2000, FRBC's records indicated that checks drawn on routing number 071102102 were to be picked up by a courier service for delivery to [Firstar], and that payment and credit for checks drawn on 071102102 were to be made through Firstar's account. Malone Aff. at ¶ 7, Ex. 1. Based on the routing number on Check and the instructions on file, FRBC's Peoria office charged Check to Firstar's account on October 23, 2000. *Id.* at ¶ 8.

(Def. L.R. 56.1 ¶ 19.) As is apparent, while this paragraph may establish the procedure for returning to checks to Firstar and establish that Firstar's account was charged by the FRBC, it does not, as defendants suggest, support that FRBC sent this Check to a courier service based on the instructions on file.

5

number encoded on the Check were both fictitious. (Pl. L.R. 56.1 ¶ 32.) According to Firstar, this same day, November 27, one of its employees orally informed FRBC that the Check was a fraudulent item. (Pl. L.R. 56.1 ¶ 34.)

On January 30, 2001, Bonnie Curran ("Curran"), a financial analyst for Firstar, phoned the Peoria office of the Chicago Federal Reserve district and requested information with regard to the Check. (Pl. L.R. 56.1 ¶ 36.) Thereafter, on February 14, 2001, Curran faxed to the Peoria FRBC office a request for identification of the source of the Check. (Pl. L.R. 56.1 ¶ 37.) Curran also sent a fax to Wells Fargo informing it that the Check was fraudulent and requesting a credit with a cashier's check in the amount of $186,597.00. (Pl. L.R. 56.1 ¶ 38.) Wells Fargo responded on March 8, 2001, stating in a collection letter that it would not accept the charge of $186,597.00 unless Firstar provided indemnification for the Check. (Pl. L.R. 56.1 ¶ 39.) Firstar refused this condition. (*Id.*)

## DISCUSSION

Before addressing the parties' cross-motions for summary judgment, the court pauses to explore its jurisdiction over this action. In its Amended Complaint, Firstar alleges that this court's jurisdiction is invoked under either 12 U.S.C. § 632 or 28 U.S.C. § 1332(a), in conjunction 28 U.S.C. § 1367. Starting with the claim that this court's jurisdiction is invoked under § 1332(a), diversity jurisdiction requires diverse citizenship between all plaintiffs and all defendants and an amount in controversy exceeding $75,000 exclusive of interest and costs. Firstar's Amended Complaint identifies Firstar and Wells Fargo as national banking associations. Wells Fargo is alleged to have its principal place of business in San Francisco, California while Firstar is alleged to have its principal place of business in Milwaukee, Wisconsin. For purposes

of diversity jurisdiction, however, the citizenship of a national banking association is determined by reference to *both* its principal place of business and "the state listed in its organization certificate." *Firstar Bank N.A.* v. *Faul*, 253 F.3d 982, 994 (7th Cir. 2001). The Amended Complaint does not specify what state is listed in the organization certificates of either Firstar or Wells Fargo.

Moreover, diversity jurisdiction would be further complicated by the presence of FRBC. In all likelihood, because FRBC is a federal reserve bank, it would not be deemed a citizen of any one state for diversity purposes. *E.g.*, *Federal Reserve Bank of Atlanta* v. *Thomas*, 220 F.3d 1235, 1241-42 (11th Cir. 2000); *Cosentino* v. *Federal Reserve Bank of Chicago*, 579 F. Supp. 1261, 1265 (N.D. Ill. 1984). Since jurisdiction under § 1332(a) requires complete diversity between every plaintiff and defendant, *see, e.g.*, *Strawbridge* v. *Curtiss*, 7 U.S. 267 (3 Cranch) (1806), the fact that FRBC has no citizenship would militate against a finding that diversity jurisdiction exists here.

Nevertheless, while no diversity jurisdiction would appear to be present, the parties rely mainly on 12 U.S.C. § 632 to invoke this court's jurisdiction. That statute provides, in pertinent part, that

> [a]ll suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits . . . .

While perhaps an argument could be made that because this suit is based on the UCC, which is a statute, and cannot, therefore, be an action "of a civil nature at common law or in equity," this argument has been persuasively rejected by at least one court.

7

In *Thomas*, the Eleventh Circuit held that even suits based on a statute fall within the language of § 632. 220 F.3d at 1244. Indeed, the court in *Thomas* appeared to have a case such as this one in mind when making its decision. The court noted that if the language of § 632 excluded actions based on statute, "the possible impact of inconsistent interpretations of the [UCC] (a statute that governs important aspects of the [Federal Reserve Banks'] activities and has been adopted in substantially identical form by almost all states) could be especially grave." *Id.* at 1243. First, the court noted that the phrase "all suits of a civil nature, at common law or in equity" was broad enough to encompass "all suits of a civil nature." *Id.* at 1240 (citing *Weems v. McCloud*, 619 F.2d 1081, 1088 (5th Cir. 1980) (interpreting 12 U.S.C. § 1819(b)(2)(A)) and *Cross v. Ryan*, 124 F.2d 883, 885-86 (7th Cir. 1941) (interpreting prior version of diversity statute)). After making that conclusion, the court examined the history of § 632, which strongly supported "the view that the phrase 'all suits of a civil nature at common law or in equity' truly means all civil actions regardless of whether such actions are based on a state statute." *Id.* This court agrees with the reasoning set forth in *Thomas* and, at least with respect to the claims against the FRBC, concludes that jurisdiction is invoked pursuant to § 632.

While § 632 provides the jurisdictional basis for the claims against FRBC, there is still the matter of Wells Fargo. The claims against Wells Fargo, though not covered under § 632, nonetheless do fall under this court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction is appropriate when claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See also, City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164-65 (1997) ("the federal courts' original jurisdiction over federal

questions carries with it jurisdiction over state law claims that 'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'") (quoting *United Mine Workers* v. *Gibbs*, 383 U.S. 715, 725 (1966)). Moreover, such supplemental jurisdiction "shall include claims that involve the joinder . . . of additional parties." 28 U.S.C. § 1367(a).

The court is persuaded that the claim against Wells Fargo involves the same "case or controversy" and is centered around the same general fact pattern or common nucleus of operative fact as the claims against FRBC. All of the claims in this case deal with the same transaction involving one check and its treatment throughout the check processing system. As such, this court's jurisdiction to hear the claims against Wells Fargo is invoked under 28 U.S.C. § 1367.

Turning to the merits, Count I alleges that both FRBC and Wells Fargo violated two presentment warranties imposed under the UCC. These warranties are found in UCC Section 4-208 (located at 810 ILCS 5/4-208(a))[5], which provides as follows:

> (a) If an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the person obtaining payment or acceptance, at the time of presentment, and (ii) a previous transferor of the draft, at the time of transfer, warrant to the drawee that pays or accepts the draft in good faith that:
> (1) the warrantor is or was, at the time that the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft;
> (2) the draft has not been altered; and
> (3) the warrantor has no knowledge that the signature of the purported drawer of the draft is unauthorized.

---

[5]Defendants accept for purposes of this motion only that Illinois law should apply to this matter.

Based on this statutory section, Firstar maintains that FRBC and Wells Fargo breached presentment warranties (1) and (2) listed above insofar as each was not entitled to enforce the draft and because the draft had in fact been altered.[6]

*1. Were FRBC and Wells Fargo entitled to enforce the Check?*

Under the UCC, an "instrument" means a negotiable instrument. 810 ILCS 5/3-104(b). A negotiable instrument is a (1) signed, (2) writing that states, (3) an unconditional, (4) promise or order, (5) to pay a fixed amount of money, (6) to order or bearer, (7) on demand or at a definite time, and (8) contains no other undertaking or instruction other than those allowed under the UCC. 810 ILCS 5/3-104(a). When a maker or drawer delivers a negotiable instrument to someone for the purpose of giving rights on the instrument to that person he or she "issues" the instrument. 810 ILCS 5/3-105(a). The holder of an instrument (including a check) is entitled to enforce that instrument. 810 ILCS 5/3-301(i) & (ii). A holder is "the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession." 810 ILCS 5/1-201(20). One becomes a holder of an instrument through negotiation, meaning "a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder." 810 ILCS 5/3-201(a). A depositary bank, such as Wells Fargo, "becomes a holder of

---

[6]Count II, which is brought against FRBC only, will be analyzed in the same manner as Count I. Count II alleges violation of Regulation J, 12 C.F.R. § 210.6(b)(1), which, similar to the UCC, provides in relevant part:

> By presenting or sending an item, a Reserve Bank warrants to a subsequent collecting bank and to the paying bank and any other payor—
> ***
> (b)(i) That the Reserve Bank is a person entitled to enforce the item (or is authorized to obtain payment of the item on behalf of a person who is either entitled to enforce the item or authorized to obtain payment on behalf of a person entitled to enforce the item).

10

the item at the time it receives the item for collection if the customer at the time of delivery was a holder of the item, whether or not the customer indorses the item . . . ." 810 ILCS 5/4-205.

Defendants' position on this motion is that each was entitled to enforce the Check because, based on definitions contained in the UCC, they were both "holders" of the Check. Firstar, in response, argues (1) that the defendants could not have been holders of this Check because the customer who deposited the Check was not a holder; (2) there was no "issue" of the Check as that term is defined under the UCC; and (3) the Check was neither a "draft" nor an "instrument" under applicable UCC definitions.

Starting with argument (3) first, Firstar is incorrect that the Check was required to be a negotiable instrument for defendants to become holders. As 810 ILCS 5/4-205 clearly states, a depositary bank becomes a holder of an "item" if the customer was a holder of the item. An "item" is a term specifically defined in the UCC: "an instrument *or* a promise or order to pay money handled by a bank for collection or payment." 810 ILCS 5/4-104 (emphasis added). Firstar would apparently mean to argue that the Check is lacking insofar as it does not contain an order to pay. An order is defined in the UCC as "a written instruction to pay money signed by the person giving the instruction." 810 ILCS 5/3-103(a)(6). Firstar theorizes that because the purported drawer is fictional, no instruction to pay was given by any person or entity and that this Check is but a worthless piece of paper. To accept Firstar's argument, however, this court would have to draw a distinction between a counterfeit check with a drawer that actually does exist and one, as is the case here, where the purported drawer is fictional. Courts dealing with the former situation have never found an issue with whether an order actually exists, instead focusing on the fact that the instrument itself is valid but has been forged. *See* Henry J. Bailey & Richard

Hagedorn, *Brady on Bank Checks: The Law of Bank Checks*, ¶ 28.03 (7th Ed. 1992) (citing *MBTA Employees Credit Union v. Employers Mut. Liab. Ins. Co.*, 374 F. Supp. 1299 (D. Mass. 1974); *Cumis Ins. Soc'y, Inc. v. Girard Bank*, 522 F. Supp. 414 (D. Pa. 1981); *Citizens Fidelity Bank & Trust Co. v. Southwest Bank & Trust Co.*, 472 N.W. 2d 198 (Neb. 1991); *Zambia Nat'l Commercial Bank, Ltd. v. Fidelity Int'l Bank*, 855 F. Supp. 1377 (D.N.Y. 1994)). Indeed, courts have been persuaded to treated forged and/or counterfeit checks as "items" under the UCC. *Citizens Fidelity Ban & Trust Co.*, 472 N.W. 2d at 201 ("A counterfeit check, as an instrument for the payment of money, is an 'item' under § 4-104(g)."). The court sees no reason to draw a distinction on grounds that the purported drawer was fictitious. The Check itself was a written instruction to pay money.

This Check contained an unauthorized signature, *i.e.*, it was a forgery. Under 810 ILCS 5/1-201(43), "'unauthorized' signature means one made without actual, implied, or apparent authority and includes a forgery." An "unauthorized signature is ineffective except as the signature of the unauthorized signer in favor of person who in good faith pays the instrument or takes it for value." 810 ILCS 5/3-403. Thus, because there was no valid signature by Business Central, whoever signed the Check for Business Central (the parties presume it to be Howard) signed it under his or her own name. As such, there was an order to pay or "a written instruction to pay money signed by the person giving the instruction." 810 ILCS 5/3-103(a)(6). The Check was signed by the person giving the instruction; the unauthorized signature of Business Central served as the signature "of the unauthorized signer."

Firstar's argument (2)–that there was no "issue" of the Check as that term is defined under the UCC–is rejected on the same grounds. Under Firstar's theory, there would never be an

"issue" of an instrument when a Check is a counterfeit or if there has been a forgery. Nothing in the UCC says as much, and as noted above, cases do not treat a counterfeit different from a forgery. *E.g., MBTA Employees Credit Union*, 374 F. Supp. at 1302 ("'Counterfeit' has no meaning in this context other than forged.").

As for argument (1), the court also rejects the notion that Wells Fargo and FRB were not holders. The UCC is very clear that possession of an instrument by someone to whom the instrument is made payable creates holder status. 810 ILCS 5/1-201(20). The Check in this case was made payable to Najam Ali Property and deposited into that entity's account. Najam Ali Property, therefore, was a holder of the Check. Since it deposited the Check into its account at Wells Fargo, Wells Fargo became a holder because it received the Check (which as discussed above was an "item" under the UCC) for collection and at the time of delivery its customer was a holder of the Check. 810 ILCS 5/4-205. FRBC subsequently became a holder by negotiation from Wells Fargo. 810 ILCS 5/3-201. Thus, defendants were holders under the UCC and plaintiff's argument on this ground is also rejected.

Based on the above, defendants were persons entitled to enforce the Check and Firstar's argument that this presentment warranty was breached is rejected.

2. *Was the Check altered?*

Under the UCC, an alternation means "(i) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party, or (ii) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party." 810 ILCS 5/3-407. The court fails to see Firstar's argument with respect to the Check's being altered. There was no unauthorized change or addition to the instrument that changed the

13

obligations of the parties. Instead, the Check was a counterfeit item in its entirety. Whatever else may be said about such a situation, it is not an alteration under the UCC.[7]

Firstar attempts to rely on a statement in *First Nat'l Bank of Chicago v. MidAmerica Fed. Savings Bank*, 303 Ill. App. 3d 176, 707 N.E. 2d 673 (1999), wherein the court noted that "[t]he [UCC rule on presentment warranties] recognizes that, while none of the parties may have had reason to suspect a fraud, the one who took from the forger was the closest to the person causing the loss and is presumed to have had the best opportunity to have prevented the loss." *Id.* at 182, 707 N.E. 2d at 677. The court's ruling in *First Nat'l Bank of Chicago* should not be surprising given that the factual scenario dealt with a forged or unauthorized indorsement. The Illinois Appellate Court in a subsequent case has correctly distinguished the factual scenario concerning an indorsement with the situation involving a forged drawer's signature.

In *Clean World Engineering, Ltd. v. MidAmerica Bank, FSB*, the court noted that reliance on *First Nat'l Bank of Chicago* in the forged drawer context was incorrect. 341 Ill. App. 3d 992, 1002, 793 N.E. 2d 110, 118 (2003). As the court explained, while a collecting bank may be liable for taking a forged indorsement, the UCC directly and separately deals with the situation of a forged drawer's signature. Under such circumstances, no warranty is breached by the depositary bank so long as "the warrantor has no knowledge that the signature of the purported drawer of the draft is unauthorized." 810 ILCS 5/4-208(a)(3). There is no evidence in the record that Wells Fargo had knowledge that the signature on the Check was false and Firstar does not

---

[7]Firstar does not argue, and appears to concede, that Wells Fargo's actions in "stripping" the Check did not constitute an alteration.

14

even attempt to argue as much.[8] Accordingly, there was no breach of the presentment warranties under either (a)(2) or (a)(3) and Firstar's claims on these grounds must fail.

Finally, based on the above conclusion that defendants did not violate any presentment warranties, the court need not address the parties' alternative arguments that Firstar failed to meet applicable deadlines in challenging the Check. Because defendants violated no presentment warranties under the UCC, their motion for summary judgment is granted.

## CONCLUSION

For the reason set forth above, Firstar's motion for summary judgment is denied [#21] while defendants' motion for summary judgment is granted [#23]. The clerk is instructed to enter judgment in favor of the defendants. This case is terminated.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: June 14, 2004

---

[8]Firstar also attempts to rely on *Wachovia Bank, N.A. v. Federal Reserve Bank of Richmond*, 338 F.3d 318 (4th Cir. 2003). Once again, however, in that case the court dealt with an alteration as that term is defined in the UCC. Someone had stolen the check at issue in that case and had altered it by putting his name in as the payee. *Id.* at 320. In such circumstances, a warrantor who would present that check would breach its warranty that the check had not been altered.